Okay, next case of the morning is number 21-20536, Ramirez v. Paloma Energy, and take your time. I realize there are several parties and so on. We'll have first from Mr. Christensen. Good morning, and may it please the court. Brian Christensen for the appellant Daniel Ramirez. I'd like to reserve four minutes for rebuttal. In granting summary judgment to Talos, the district court erred because it made credibility determinations, weighed conflicting pieces of evidence, drew inferences, and made assumptions about the record that were favorable to Talos but not Mr. Ramirez. In granting summary judgment to Paloma, the district court misapplied Louisiana law regarding duty and ignored key facts establishing Mr. Petrae's breach of that duty. I will first address the Talos order and then the Paloma order, although I'm certainly happy to address any of the court's questions as to either defendant at either time. The district court erred in granting Talos's motion for a summary judgment. Contrary to the court's conclusion, a reasonable juror could find that Mr. Ramirez would have received TPA within the critical four-and-a-half-hour window had he been promptly evacuated from the Talos platform. First, viewing all facts... Fell asleep at 7 o'clock, right? 7 p.m.? I'm sorry, Your Honor? Fell asleep at around 7, 7.30 p.m.? The record is between 7 and 8 p.m. So, he would have had to have gotten the treatment by 11 p.m.? So... So, this is a question about the last well time principle, right? Correct. That's a fundamental issue, is the time of Mr. Ramirez that was last known well or also his symptom claimed repeatedly that his symptoms began after he awoke that morning of May 19, which he... And so, first, the question... Isn't the problem that he didn't tell anybody that on that very night? Is there any evidence that he said to people, I was fine when I noted, he states, he went to bed at 1900 hours last night feeling okay. If we also look, say, to the... This is record 1303... Wait a minute, don't leave that unless you're going to tie it together. All that says is 7 o'clock was the last well time. So, what about that first... You want to elaborate on the importance of that first sight you just read to us? Well, certainly. So, Dr. Will... So, let me continue the note, then, from Dr. Mayer, where after that, in his contemporaneous record, he states, he woke at approximately 1.30 with complaint of feeling like left side of his face was numb and weak. So, isn't that the problem? Well, if you look at Mr. Ramirez's statements to his co-workers, to his various medical providers, and I can catalog them for the court... Well, it may be necessary. Of course, your briefing tried to do that, but I'm sort of on the same page right now with Judge Ho, and I need to be convinced that at the time, the medical professionals who were dealing with him that night, that one of them or some of them were told, I was feeling great at 1.30 when I first got up, and it was after I got up that I started... After I got up that I started feeling bad. And, of course, your first take at that did the opposite. So, what else you got for us? Sure. First, his statement to Mr. Glancy, the medic. If you look at record 1027, Mr. Glancy's contemporaneous report states, patient states he woke up to use restroom at 01.30 hours, and when he stood up, he felt dizzy and staggered to his left, to the wall. The symptoms of a stroke... How does that help you? Because it suggests that the onset of symptoms occurred after Mr. Ramirez awoke and after he stood, and then Mr. Ramirez subsequently testified... I'm not sure it does. What I'm hearing you saying, and I can pull it up in a moment, is he woke up at that time, and he felt the symptoms as he was standing up. Correct, after he stood. That doesn't mean he was okay. I mean, I take it your point is it's implicit that he was okay before he stood, and that the potential stroke was happening at the very moment he was standing up, but it was not happening seconds earlier. Is that your theory? That's correct, that's correct. For example, Mr... That's broad of an interpretation of that, isn't it? I'm not hearing that he was literally fine when he woke up, and then a minute later, when he got up, is when it started. Might be unfair? Well, it is well established that the symptoms of a stroke onset rapidly, and so Mr. Ramirez's testimony, say, in his deposition was that the symptoms began after he had walked to the bathroom and began to urinate, and if you look, say, at the deposition... I guess what I'm wondering is where is the statement that I was literally fine, I am positive I was fine, when I woke up at 1 a.m. or whenever it was, and then two minutes later, five minutes later, go up to go use the restroom, all of a sudden, that's when it starts. That's the statement I'm looking for. Well, again, the contemporaneous note from Dr. Mayer as to the onset time states, he states he went to bed at 1,900 last night feeling okay, and then patient states, excuse me, he woke at For example, if you look at Mr. Ramirez's statements as reflected by, in the deposition of Mr. Breland... I'm sorry, let's go, you're saying it's at 1027? What you're citing? That is his statement to the medic Mr. Glancy, correct? What's the sentence you think is helpful to you? It's toward the bottom in Mr. Glancy's narrative, where it says, patient states he woke up to use the restroom at 0130 hours, and when he stood up, he felt dizzy and staggered to his left, to the wall. Yeah, what I'm missing there is a statement that he was fine when he woke up. Right, so certainly at the summary judgment posture, within the ambiguity of this testimony, it is the court's obligation to construe these to Mr. Ramirez. Right, but let's keep in mind, we're talking about what somebody could have done to help. As I understand it, if you give this medication, this treatment, sorry, to somebody who is beyond the four-hour period, it actually could be very dangerous. I'm sorry, go ahead, I think I got it right. If you misdiagnose this, and you apply the treatment, this is a, give it just in case. I mean, if you give it when you shouldn't give it, it actually could be very dangerous. So we need to be very careful about providing this treatment only when the medical professional is confident that the protocol has been met. So where is the statement in the medical professional's mindset that I know for a fact that he was the cause of this? Well, all of the medical providers believe that his last known well-time was at 7 or 7.30 p.m. But to begin, only one of those providers mattered as to causation, which is Dr. Mayer. That's because it is undisputed that only the hospital could administer the CT scan, which would eliminate a hemorrhagic stroke and provide for the possibility of an ischemic stroke, which Mr. Ramirez ultimately had. But looking at, and it's undisputed that only the hospital could administer TPA. Dr. Mayer began his shift at 5.55, and if you, and that a reasonable juror could conclude from the evidence that a different provider would not have made the decision. I'm not sure I agree with that, because if a reasonable medical professional sees this statement, he woke up to use the restroom, and when he stands up, he feels dizzy, I don't know why you think a professional should immediately assume, well, he was obviously fine at that time. Well, so, for example, Dr. Mayer stated that a patient's last known well-time is his symptom onset time, which is, he says, the last time. Nobody's disputing that. Nobody's disputing that principle. The question is how does it apply to that sentence? Right, he said, it is the last time you knew you were well. And if you, so Mr. Ramirez. So you're saying from that sentence, everybody should understand, or a reasonable person would say, oh, so you were fine at that time. Just as you were not fine at that time. That's how I'm reading it. So, for example, if we also look at the statement to Mr. Halcom, the medevac paramedic, the statement is, quote, I got up to go to the bathroom, and he said he had the symptoms then. That was his exact statement. Sounds like the same thing. Well, I wake up, I get up, I have symptoms. Right. And so, I wake up, I'm fine. A few minutes later, I get up, I'm not fine. That's what I'm looking for. Mr. Ramirez's testimony is consistent that the symptoms arose after he stood up. So there is not an express affirmative statement that he felt fantastic upon the Isn't that important? Is it important to have that statement? I am fine at time X. Well, the question is when the symptoms arose. And Mr. Ramirez does not state the symptoms arose upon the moment of waking. His testimony is consistent. The symptoms arose when he stood or when he began to urinate. The question I have is he got on land to the hospital around what, 4.30 or 5 in the morning or before then? It was at 5.38 is when he arrived at the hospital, admitted at 5.39. So, as I understand it, even if he had awakened at 1.30, four hours had already elapsed by the time he got to the hospital. That conclusion depends entirely on the assumption that his symptoms began the night before. No, I'm saying even if his symptoms began at 1.30, it's a four-hour window, right? So, if we look at the timeline, after Mr. Ramirez awoke, had he been promptly transported, the call from the platform occurred at... I don't care what time all that happened because nobody's going to give him the TPA until he, A, he's in the hospital, B, he's had a CT scan, right? That's correct, Your Honor. And time elapses once you get to even to an emergency room. And to answer your question, the total time from the telephone call to the medevac until he was admitted was two hours. Then the initial hospital protocol was one hour in which the CT scan occurred. And then assuming the MRI was necessary, that took one half hour. The totally elapsed time there is three and a half hours out of a four and a half hour window. So, there would have been an hour in which the hospital could have... You're assuming a level of performance for offshore facilities. The most onshore facilities probably couldn't match with a person who lived down the road from them. Well, I know there's triage and all that, but I mean, you're assuming a seamless... You're assuming basically that somebody immediately said you're having... agreed you're having a stroke, immediately got him on land, immediately got him into all the treatment protocols. Every one of those facts are supported by the record. For example, Mr. Petrae states that that in his recollection that there was a... that he... that brought Mr. Breeland back to Mr. Ramirez within 15 minutes of being awoken by Mr. Ramirez. So, a juror could say, look, Mr. Ramirez awoke. He could have immediately... Well, he did awaken Mr. Petrae. Mr. Petrae immediately brought Mr. Breeland. I thought your argument in your other case is that Petrae didn't act fast enough. Well, that's correct. Well, I hope you don't have one jury for both of those. Your Honor, with respect, the... Mr. Petrae could... the juror could view these facts where he would have been promptly evacuated from the platform and then arrives to the hospital within two hours and then the record sites show that the hospital's timing did follow that... that timeline that I indicated. And Dr. Mayer indicated that the hospital could even expedite its procedures depending on the recommendations from the initial provider. But Dr. Mayer decided not to give him the TPA, right? That's correct. And he made two fundamental errors there. First, it is undisputed that he did not speak to the flight crew. He departed from his normal procedure, which is to speak to the flight crew dropping off a patient. And, of course, he began his shift at 555. The flight crew had just arrived. And so he could have read the nurse's note, which documented the existence of Mr. Ramirez's unsteady gait, which is a key sign of stroke and not of Bell's palsy. But those two errors led Dr. Mayer to not administer TPA. He gave one explanation in his contemporaneous note. Quote, TPA was not indicated. Due to the suspicion, he has a Bell's palsy. That's at record 1140. Dr. Mayer's subsequent explanation two years later about last known well time arose only in litigation and after a review of the medical records. So in some a different provider would not have overlooked his gait, would not have misdiagnosed with Bell's palsy, and would have properly assessed Mr. Ramirez's symptoms based on his onset time as he reported it to different providers. Unless the court has any additional questions as to Talas, I'll briefly address the Paloma order. No, go ahead. The district court erred first in finding no duty because Louisiana law requires that duty be reflective of the unique facts and circumstances, industry standards, and a company's explicit policies. Here, this is an industrial worksite 25 miles into the Gulf of Mexico. It takes four and a half hours to get there by boat. There are no doctors. There are no hospitals. And so Talas's procedures required reporting of all possible emergencies as actual emergencies. There is plainly a duty here or alternatively under the negligent undertaking doctrine. The district court erred by finding no breach as well because of Mr. Petrae's delays. I see my time has expired. Go ahead. You can have an extra minute or two. The court's, the key facts that the court overlooked first is that the court improperly reported the competent evidence of Mr. Petrae's email from that morning, which he sent at 414, stating that he had been awakened by Mr. Ramirez regarding his symptoms a little before 0100 hours. That's at record 1362. But Mr. Petrae did not notify Mr. Breland according to other testimony until nearly 2.15 a.m. Paloma's brief concedes that Mr. Petrae was responsible for Mr. Ramirez's until the time Mr. Breland was awakened, but he's substantially delayed. And even if you agree with the district court that Mr. Petrae delayed contacting Mr. Breland for 15 minutes, well, minutes matter in the stroke. Mr. Ramirez testified that he told Mr. Petrae he was having a stroke, that he wanted to go to the hospital, that he wanted a medevac. But Mr. Petrae delayed contacting Mr. Breland. And even if he did not delay, Mr. Petrae also had the authority to directly call a medevac or to directly call the teledoctor. The medevac had been used three to four times a year. Mr. Breland said he had used the teledoctor number many times because, again, in this unique environment, there are no hospitals or doctors. So that's why publicly posted information to contact these providers is everywhere on the platform. Because there are tribal issues of fact as to both duty, breach, and as to Talos's effect on causation, this court should reverse it. Okay, I have one other question. Was he covered under the Longshore Act? You know, Your Honor, I respectfully do not know the answer to that. This is an OSC, OSLA case. Right, well, if it was in state waters, he'd be covered under state workers' comp, I believe, if he's on a fixed platform. Offshore, OCSLA on a fixed platform, I think it's the Longshore and Harbor Workers Act. You know, Your Honor, I . . . He's your client. Okay, well, maybe you can figure that out. Just wondering. Thank you. All right, maybe the other counsel know. Next, we'll hear from Mr. Jergens for Talos. Good morning, Your Honors. Jack Jergens for Talos. At the outset, Judge Jones, Mr. Ramirez was working on OCSLA platforms. He is a LHWCA covered worker. Presumably, he's gotten some reimbursement from that. Yes, Your Honor. Then how come . . . I mean, oh, but you're not his employer. No, I'm the third-party alleged tortfeasor. Right. I sue for a lot more than comp. Right. Judge Ho hit the nail on the hemorrhagic, where you've got a hemorrhage in the bloodstream, and ischemic. If you give a TPA to somebody who's having a hemorrhagic stroke, you know what you've done? You've killed them. If you give them to ischemic stroke victims without the proper testing having been done, and they didn't even complete the testing to determine this fellow had an ischemic stroke until 8.30 a.m., again, you do that, you put him at giant risk for something very, very bad happening. And I suggest to you that if they had given Mr. Ramirez a TPA, Talos would not be the party to be sued. It'd be the doctor for his alleged errors. And let's . . . the Court obviously has seized what the issue is on the cause and fact. What did he tell his health care providers that night? And this is what Judge Rosenfeld keyed on in her opinion. And I'd like to read from Record 1571. I believe it is the 17th . . . page 10 of her opinion. Judge Rosenfeld. Judge Rosenfeld, sorry. I have an expert . . . Judge Rosenfeld. Quote, every medical professional who treated Ramirez on May 19, 2019 testified that Ramirez's last known well time was 7 or 7.30 p.m. when he went to bed and acted on that basis. Even if Ramirez is correct that his last known well time was 12.45 a.m. and even if Ramirez had arrived at the hospital before 5.15 a.m., the treating doctors would not have administered TPA based on their belief, accurate or not, that his eligibility for TPA treatment had expired before Ramirez even woke at 12.45 a.m. on May 19, 2019. That belief was based upon what Ramirez told the health care providers that night. When he was deposed, there was discussion about Mr. Ramirez's testimony. He was never asked a word about what he told the health care providers that night. He told a different story in his deposition. But what's uncontroverted in the record, the three health care providers, let's just look at it. The first one was the medic on the platform, Chris Glancy. His testimony, Mr. Glancy's testimony, it's pages 1021 and 1022 of the record. Ramirez told Glancy that he went to bed at 7 p.m. on May 18, 2019. He woke up at 1.30 a.m. to use the bathroom and when he stood up, he felt numbness on the left side of his face, nausea, dizziness and inability to stand. Uncontroverted in the record. So then the next health, the, he stopped you there. One of the things Glancy said also, potentially the symptoms started with his headache the prior day. That's correct because he went to bed. It was much made of that. I've seen that maybe only here someplace else. Was that much of an issue in the district court that may even have started long before? Well, that would be a fortiori that my position is correct because if his problem started prior to 7 p.m., then the last known well time is earlier and the window for administering a tpa has expired even sooner, even far in advance of when he woke up. Any of these doctors asked, or is there any testimony that if his symptoms started when he was asleep after 1900, that they would have awakened him? No, no. It wasn't addressed? No one spoke to that? No, what the American Heart Association rules provide, that if somebody's asleep, you don't know when the symptoms began. So you assume the last, his last known well time is the last time he says he was okay. And what he told everybody that night, the same, it was the same story that night. I stopped you as you were going through what the medical professionals are saying. Yes, sir. Your honor, the next, the next one, and this is really, really Chuck Halcombe was the medic on the helicopter and the helicopter gets Mr. Ramirez at 4 45 a.m. So Mr. Halcombe on, on the helicopter ride, he's talking to him and he noted in his report that the last known well time was 7 30 p.m. on May 18, 2019. Excuse me. This was based on Ramirez's statement to Halcombe that he had gone to bed at 7 30 p.m. without stroke-like symptoms and had awoken at 1 30 a.m. on May 19 with stroke-like symptoms. And if you want to read the exact verbiage, it's pages 11, 1104, 1105, 1106, and 1141. And it, Halcombe goes even further. Well, he's, he testified due to Ramirez's last known well time being 7 30 p.m. on May 18, he did not meet the requirements to receive thrombolytic drugs in flight because such, such anti-clotting drugs are time sensitive. That's, that's page 1102 of the record. So even in the helicopter, they weren't going to give him thrombolytic drugs because it could kill him. Now, when we get, he gets to the hospital and what does he tell Dr. Mayer? Pages 1040 and 1041 of the record. Dr. Mayer, Mayer saw him at 6 a.m. on May 19. Ramirez told him he went to bed at 1900 last night, feeling okay with a left-sided headache and that he awoke at approximately 1 30 a.m. on May 19 with complaints of feeling like the left side of his face was numb and weak. Based on these statements, Dr. Mayer concluded, testified his last known well time was 7 p.m. That had also been communicated to the hospital by Mr. Halcom from the helicopter. Dr. Mayer believed that as the time Ramirez woke up on the platform, the window for administering a TPA had already expired. Now, the statements that were made to Glancy, Halcom, and Dr. Mayer, they're uncontroverted in the record. Ask for something where there is some, in his deposition, Ramirez changed his story a little bit about what happened, but he didn't change his story about what he said to the doctors and that's what matters. Is there anything in the doctor's notes from that night, next morning, where it explicitly says we will not administer this treatment because the last this understanding of what happened come up later? No, it was alluded to by your friend. I can't at this point, I can't cite you to something in the record. I mean, was is anything in the medical records from that night morning that says here's the right way to treat this if we had known sooner, but it's too late? No, no, no, and as a matter of fact, the way Dr. Mayer testified, I can't give you the exact site on this, um, once, once they realized he was, he was, he was outside the window, they were off, they were off of the stroke protocol, uh, and, and there's this, there's notes in the record that also at first Dr., uh, Dr. Mayer thought he was suffering from Bell's palsy and that was, that was when they did other testing at about 838. They realized that he, that he had some sort of ischemic stroke, but it is uncontroverted in, in, in the record. He would not have received this treatment, even if he had been telepathically transported to the hospital at the very moment he woke up, he wouldn't have received it. Dr. Mayer testified Ramirez treatment would have been no different if he had arrived earlier on the morning of May 19 at 1 a.m., 2 a.m., 3 a.m., it didn't matter. He was outside the window and it's very critical in, in using, administering a TPA. They're very dangerous and didn't discuss this, but, but getting family consent to it is also an issue because it is so dangerous. Um, in, in, in conclusion, let me just do one other thing. There was mention about, uh, maybe another, another doctor, uh, would have done, would have done something different. There was no evidence whatsoever of any doctor doing anything, anything, anything different. Not one judge, uh, the trial judge recognized that point. So, uh, I mean, I think the record is as clear as it could possibly be on this point. And if you have any other, um, concludes my remarks unless you have any questions. No, sir. Thank you. All right. Thank you. Okay. Mr. Higgins. May it please the court. The summary judgment should be affirmed as to Paloma Energy Consultants because there is no duty in this case and there is no evidence of, even if there was a duty, there is no evidence that Paloma's employee, Madrid Petre, uh, failed to, uh, uh, delay. And I think with respect to the delay, the court does not even need to reach the question of duty because there's no, because the evidence, the evidence, Mr. Ramirez's, Mr. Ramirez's own for Mr. Ramirez. Mr. Ramirez testified that 15 minutes elapsed from the time that he woke up to the time that the person in charge, Joe Breland, was, uh, in the room with him. And Joe Breland was the person in charge on the platform. Uh, he was the equivalent of the captain of the to aid under Louisiana law. There is no case, no statute, no rule of jurisprudence in Louisiana that has adopted a general duty to come to the aid of a person absent certain circumstances. And there's really an argument by the plaintiff that an offshore platform is a different environment. Well, that's not been, that's, that's not the law in Louisiana. And if Congress wanted to adopt a specific special duty for offshore oil platforms, it certainly could have done that when it adopted the Outer Continental Shelf Lands Act. It did not. Congress directed courts to apply the law of the state closest to the, uh, platform. Briefly, on the question of a duty to aid, I believe the Strickland versus Ambassador Insurance case that is cited in, uh, Palermo's brief, uh, 422 S.O. 2nd, uh, 1207, is, uh, legally on point. Because that was a case where the defendant undertook an attempt to aid. The defendant did not succeed in that attempt. The court said there was no duty. There was no duty in that case because there were none of the three requirements for a duty to assist that were present. Uh, the defendant did not create the peril. The defendant did not deter others from helping. And there was no special relationship. And what was lacking in Strickland is also lacking here. Uh, one final point. This is not a negligent undertaking case. This is a failure to aid case. Because the complaint in this case is that Mr. Petrie did not act. That he did not act. That's the complaint. And none of the cases that plaintiff has cited, uh, uh, for negligent undertaking apply here. Unless the court has, uh, questions, I would be happy to yield my time back. All right, sir. Thank you. All right. Thank you. Okay, Mr. Christensen. I have two points as to, uh, Talos and two as to Paloma. First, our theory is simply that, had Mr. Ramirez been promptly evacuated from the platform, he would have received TPA from a different provider who would have properly assessed his symptoms, asked the proper questions, and, and understood that his symptoms began after he arose and stood or began to urinate that morning. The no medical provider here has suggested that his headache of the previous day was his last known well time. Uh, Dr. Mayer took no such position, nor did Mr. Halco. Second, even if we assume that these various providers, the medic, the paramedic, uh, that, that their opinions, that they had an effect as to causation, which they did not because they could not administer TPA, that's not disputed, their statements are, uh, not, as the district court said, somehow unanimous as to last known well time. They applied different standards. They disclaimed knowledge of last known well time or actually agreed with Mr. Ramirez as to his symptom onset time. Uh, Mr. Glancy, for example, disclaimed any opinion on last known well time. He said a record 1022. That I don't know because I didn't ask that. And then, uh, second, Mr. Halco insisted on a third party witness standard for last known well time. A standard Dr. Mayer did not apply. Dr. Mayer said the last known well time self-reported beginning of symptoms, but Mr. Halco required that a last known well time could be established only when one is witnessed as being well by a third party. Uh, but of course that standard wouldn't work for millions of Americans who live alone. Uh, and Mr. Halcom's contemporaneous notation, while it does record the last known well time of 730 or seven, seven o'clock records an onset time of 1 30 AM and that's at record 1114. As to Paloma's statements, its arguments, first, uh, it appears to us that this case is sui generis. We have not seen a case examining the question of duty on an offshore platform in extremely sparse environment like this. Um, again, it is not like our ordinary onshore life negligent undertaking or failure to act. Well, we argue both. We argue that a duty exists here as established by industry standards, a duty to report and to aid, uh, which is replete in the testimony of Mr. Womack, the safety supervisor of Talos, Mr. Breland, Mr. Petrae. They are unanimous that industry standards and Talos policies required, required a air on the side of caution, mandatory reporting of even minor medical events and to treat possible emergencies as actual emergencies. Uh, so the, the industry here is, uh, very clear about what those standards are. There's nothing wrong with the industry exceeding the negligence standard. Uh, certainly, Your Honor, but industry standards are informative to the question of duty. You didn't ask, uh, for us to certify this to the Louisiana Supreme Court. That's correct, Your Honor. Uh, but the, the way I, the, the way . . . What's your best case? Just tell us what your best cases are. Our best case is probably, uh, DECLUE or DECLUET, uh, D-E-C-L-U-E-T. In that case, a, a high school principal, uh, was bound by the school's policies and procedures to report, uh, emergency events, to contact the emergency providers. And that policy and procedure was required, uh, in order to, um, uh, it, it required him to act and therefore became the, the basis for determining, uh, duty. So, um, uh, thank you. This court should reverse. All right. Thank you very much. Uh, very interesting cases. We are in recess until 9 o'clock tomorrow morning.